## EDGAR Z. PELLS AND CHARLES BOGARDUS, ADMINISTRATORS,

### v.

## THOMAS SNELL ET AL.

*Limitations—Absence from State—Railroads—Construction Contract—
Location of Station—Subscription to Influence—Recovery of—Principal
and Agent—Contract against Public Policy—Special Interrogatories—
Evidence—Instructions.*

1.   Agency may be created, in the absence of a previous agreement, by
the subsequent adoption or ratification of the party entitled to the benefit of
the act involved.

2.   The receipt of money belonging to another renders the person who
receives it the trustee of the former, and the bringing of an action by him
for its recovery, is an adoption or ratification sufficient to charge the latter
as agent.

3.   That clause of the statute of limitations which declares that the
time of the absence of a person from, and residence out of, the State after
the accruing of a right of action, is no part of the time limited for the com-
mencement of suit, means an abiding, remaining, sojourning or dwelling
at a place for so long a time continuously as to indicate that it was not
merely temporary, with a view to the business or health of such person.

4.   In an action for money had and received, it being alleged that own-
ers of property adjacent to a railroad line, with a view to influencing the
location of a station, gave their promissory note, payable to a third person
who collected the same as agent for and in pursuance of an understanding

with construction contractors within whose discretion such station was established, this court holds that the evidence sustains the verdict for the plaintiffs.

[Opinion filed January 21, 1889.]

APPEAL from the Circuit Court of Ford County; the Hon. C. B. SMITH, Judge, presiding.

Messrs. C. H. WOOD, A. SAMPLE, E. C. GRAY and F. L. COOK, for appellants.

Messrs. JAMES S. EWING and T. C. KERRICK, for appellees.

PLEASANTS, J.   In the spring of 1871 the board of directors of the L. B. & M. R. R. Co., of which William H. Pells was then a member, let to appellees' firm the contract for the construction of its road, which was to extend from Bloomington east to the State line, at a specified price per mile.   By the terms of the contract, Snell, Taylor & Co. were given the right to locate the stations east of McLean county, with the consent of the chief engineer of the T. W. & W. R. R. Co., which had already leased the contemplated road and guaranteed the construction bonds of the company, the other directors having reserved the right to locate stations in McLean county.   Mr. Pells, who owned a quarter section of land on the line of the road near Sugar Creek, in Vermillion county, desired to have the privilege or right of locating one east of McLean, and, as he claims, Mr. Taylor, of the contracting firm, agreed that he might have it.   About the first of October, 1871, the grading of the road having been finished to a point near to it, the land owners and residents about Sugar Creek were desirous of securing a station there, and to that end to secure the influence and aid of Mr. Pells.   They conferred with him in relation to it, and on the 18th of that month got up or started a subscription paper in the words following: "Know all men by these presents, that whereas we, the undersigned, are desirous of securing the location of a station and the erection of a depot building on the E. ½, Sec. 10, T. 23, R. 14, W. of 2d

P. M., in the county of Vermillion, State of Illinois, and on the line of the L. B. & M. railway; and whereas we are desirous of obtaining the aid and services of Wm. H. Pells for the procuring this said location and the erection of a depot building as aforesaid; now, therefore, each of the undersigned and every one of them does hereby agree and bind himself, his heirs and assigns, that if a station shall be located on said railway, on the tract of land above described, and a depot building erected at such station, to pay to said Wm. H. Pells, his heirs or assigns, the sum of money by him hereinafter subscribed and set down opposite his signature in said list, within six months from the completion of side track and buildings aforesaid. Sugar Creek, Vermillion County, State of Illinois, Oct. 18, 1871;" which paper was afterward subscribed by divers persons so interested, with different sums, amounting in all to $3,400, and delivered to Pells. Of this proceeding Snell, Taylor & Co. had no knowledge or information until the following spring or early summer. So far there is no controversy, but it is claimed by appellees that in that winter or early in the spring of 1872, when the iron had been laid to Paxton, the grading extended east, and all the stations required for the interest or convenience of the railroad company or of the public had been established up to and including one at Rankin, only one mile west of the land above described, no point had been designated by Pells for a station under the alleged agreement of Taylor, Pells first expressed his desire to Snell to have one located on that land; Snell then told him that in view of the one at Rankin, it was unnecessary and would not be done unless they were to be paid for it, stating the amount required at three or four thousand dollars; and that Pells replied, in substance, that the money for that purpose would be raised. Pells flatly denies that he ever had such a conversation.

It appears that about the 17th of June, and before anything was done toward the establishment of the station, Snell, having heard of the subscription mentioned, sent Mr. Cook, now of counsel for appellants, to see the subscribers and obtain a promissory note to Snell, Taylor & Co. in lieu

of it.   They declined to give such a note, but agreed to make one to Pells.   Cook accordingly drew up a note to him for $3,400, payable nine months after date; left it, undated, with one of the subscribers to procure signatures, and the same night or following day reported to Snell, who claims that he thereupon immediately took some steps toward the establishment of the station; just what, or whether anything was so done by appellees or their sub-contractors, is by no means clear from the evidence.   It appears that they then, or previously, laid a plug or spur track, about four hundred feet in length, which was afterward used in making the permanent side track of twelve or thirteen hundred feet; and it is claimed that they also began the erection of the station house, or provided the material for it.   But certainly before the completion of either, on the 26th of June, on a controversy which had arisen with the Wabash company as to how nearly they had completed their work under their construction contract, they turned the road over to that company to finish, allowing it therefor the sum of $10,000, to be deducted from what would be due upon its completion.   The switch and side track were completed in July, and the station house in September.   Appellees claim that whatever was done by the Wabash company was done for them, under the arrangement referred to, and is to be regarded as if done by them, which appellants deny.

The note above mentioned, having been signed by several of those who had signed the subscription paper, was delivered to Pells on the 27th of November, but dated back to the first of October; and at the same time, though under date of July 23d, he indorsed on said paper an assignment of said subscriptions to the makers.   Mr. Cook, as agent of Snell, Taylor & Co., either in that month or later, demanded the note of him for them, to which he replied that he had no note in which they had any interest.   In May, 1873, he sold and assigned it to O. B. Taft, of Chicago, and received the money thereon, which he appropriated to his own use.

Thereupon, on the 26th of August, 1880, appellees brought this suit against him, in assumpsit, on the common counts.

The pleas filed were the general issue and the statute of imitations. To the latter they replied, among other things, that after the cause of action accrued, the defendant departed from and resided out of the State for different periods, which left for the time of his being within it, after the cause of action accrued and before the commencement of the suit, less than five years; on the traverse of which issue was joined.

In the first trial, the court instructed the jury, in substance, that if plaintiffs relied on a contract with the makers of the note, or the defendant, to locate a switch and station at Pells-ville, when neither the public convenience nor the interests of the stockholders of the railroad company required it, but solely to get money for the job, then such contract was void and they could not recover upon it, if Pells was a director of said company and was employed by plaintiffs as their agent to raise the money upon such contract and by subscription; and refused to instruct, as asked on behalf of plaintiffs, to the effect that if Pells received the money, as their agent, he was estopped to deny their right to it.

Without argument upon the facts a verdict was returned for the defendant, and judgment thereon entered. From this judgment plaintiffs took an appeal, on which, by agreement of the parties, approved by the Circuit Court, the only question submitted was upon the rulings in reference to the instructions, and therefore the record did not contain all the evidence introduced on the trial.

The judgment was here affirmed, but on further appeal was reversed by the Supreme Court—holding that if the contract referred to was illegal, it was so only because against public policy; " and in such case an agent who has received money for his principal can not, by law, set up such supposed illegality as a reason why he should not pay over the same to his principal. * * * He is estopped by the relation of agency and the receipt of the money." Snell, Taylor & Co. v. Pells, 113 Ill. 145–50.

On remandment, the death of the defendant being first suggested and appellants substituted, the cause was, by agreement, submitted upon the reported evidence produced on the

former trial, subject to objection for incompetency or imma-
teriality, and under instructions which, upon the point involved
in the former appeal, conformed to the opinion of the Supreme
Court.   The jury found, specially, that Pells was not the
agent of Snell, Taylor & Co. in obtaining the subscription
paper in evidence, nor in procuring the $3,400 note, but
that he was such agent in obtaining the money on said note,
and that his residence, from May, 1873, to August, 1880,
was Ridgway, Orleans county, New York, and a general verdict
for plaintiffs for $5,032.   Motions for a new trial and in arrest
were overruled, and judgment entered for plaintiffs on the
general verdict.   Defendants now appeal and assign numerous
errors.

The evidence preserved in the record is quite voluminous,
and the arguments here, both printed and oral, were very
elaborate.   As affecting the merits, however, only two prin-
cipal questions of fact are presented, viz.: first, whether there
was an understanding between Snell and Pells, that Snell,
Taylor & Co. were to be paid for the station if they should
locate and build it at Pellsville, out of the money to be raised
on the subscription or note mentioned, and second, whether
they performed the condition.   Appellants' counsel, insisting
that if there was such an understanding it was against public
policy, so that Pells could be held liable for money received
by him in pursuance of it only in case he received it as agent
of appellees, now urge that the instructions given upon the
hypothesis of such agency and the finding of it as a fact by
the jury, were wholly without warrant or basis in the evi-
dence.   The argument is, that the only proof relied on to
establish agency, is the alleged conversation between him and
Snell; that according to the testimony of Snell himself, this
alleged conversation did not occur until months after the sub-
scription was obtained; that the note was but a substitute for
the subscription and like it made payable to Pells, the makers
expressly refusing to make it payable to Snell, Taylor & Co.;
that the jury specially found there was no such agency in
obtaining either, and, as matter of law, that Snell, Taylor &
Co. could have no more right to the proceeds than to the sub-
scription and note.

Throughout this argument the term "agency" seems to be used to signify a relation created by an agreement, express or implied, made between the parties before the performance of the act in question and with reference to it; and probably to a jury that idea would be imported by the language of the instructions. It is the popular idea. In that view they might well find there was no agency in procuring the subscription or note; and yet, if they believed from the evidence that before the money was received by him Pells gave Snell to understand that his firm would be paid out of that money when received, if they should have then put in the station upon that understanding, and also find that he received the money for them in pursuance of an antecedent agreement, they could properly infer that he acted therein as their agent. We perceive nothing absurd or unreasonable in the position that Snell, Taylor & Co. might have no right to the subscription or note, and yet have a very clear right to the money proceeds in the hands of Pells. If he made no promise to assign it, nor incurred any personal liability to pay except on receipt by himself of the money, then so long as he continued to be solvent, and to use good faith and due diligence to collect it, he would have the right, even as against them, to retain it; and yet when he received the money on it he would receive it for them, and be liable for it to them in this action. Whatever may have been the purpose with which he received these papers, or the intentions of the subscribers or makers in respect to them, they would be immaterial upon the question of his relation and liability to the plaintiffs, with reference to the proceeds. These would depend wholly and solely on the understanding between him and them as to these proceeds, and their action upon the faith of it.

But agency in respect to any given act, may also be created or established without a previous agreement—as by subsequent adoption or ratification by the party entitled to the benefit of it. This is an action for money had and received, which is an equitable action, that lies wherever one has received money which *ex equo et bono* belongs to another and failed to pay it over. In such case the law implies an agreement to

pay it. By the receipt of the money he makes himself a trustee, and the bringing of the action is an adoption or ratification sufficient to charge him as agent in receiving it. We perceive no reason why this is not all the agency required to be shown in this case, even if the arrangement for securing this station was illegal as being against public policy; but we are not to be understood as holding or conceding that under the circumstances of this case it was illegal.

Upon the question of fact as to the existence of the understanding, there was before the jury the positive testimony of Mr. Snell. He does not pretend to remember the precise language used by Pells, when informed that they would not put in the station without pay, and that it would require three or four thousand dollars to pay them for it. He gives different forms of expression—that " he " or " we " " would " or " could " " raise " or " get up " the money; and counsel argue from the mood and tense stated that he could not have referred to the money already subscribed. But the witness also said he didn't know but it was that " the money had been raised." In one sense it had been, and in another it had not, but only promised. We think there is no force in this suggestion. By either form of expression, in view of the facts, the jury would understand that he referred to the subscription, whether it had then been completed or not—which does not appear, though it had been started some months before. It is evident that when Snell afterward heard of the subscription he supposed it was what Pells had reference to as having been done, or as to be done, and that it was for money to pay them for the station; for he immediately sent Mr. Cook to " see that the papers were made straight," and to get a note in place of the subscription. In so doing he entirely ignored Pells; which would have been a rare exhibition of impertinence, except for that understanding, but with it, was quite natural and reasonable.

It is also suggested that Snell admitted he looked to the road for their pay. The record in one place does make him say in answer to the question, on cross-examination, whether he looked to Mr. Pells for it, " No, I looked to the road."

We think it clear from the context, however, that the word he used was not "road," but "note," and the reporter must have mistaken it, as he did in the cases of other witnesses in several instances. The same question, in almost the same words, had just before been put to him, and his answer was, "I was looking to the subscription, or whatever else was going to make a good note." On re-examination he said, "I supposed I was to get that note or the proceeds of the note." He had also testified that the stations from Bloomington to the State line which were to be fixed for the company, had all been fixed; and his statement of his refusal to put in the station at Pellsville unless he was paid for it, shows it was put upon the ground that they could have no claim for it against the company, that is, the "road." There is no way of evading the fact, or the legal force of the fact, that Snell testified distinctly, in substance, that Pells told him the money required to pay his firm for the station house and necessary switches and side track, would be provided for by the property owners and residents of the neighborhood, nor of the inference from his testimony, that Pells had reference to the money then contemplated by the subscription paper in evidence.

Snell alone testified to this conversation. He was not certain when or where it took place, or who if any others were present. He thinks he may have had several talks with Pells about it. He met him at different times and places while the work was going on. It was in the winter or spring of 1872, probably in the spring, and at the Bennett House in Paxton. A long time had elapsed and his memory on these points was not clear. But he was very positive as to the substance of what Pells said and the connection in which he said it.

The only other direct testimony in relation to it was that of Mr. Pells, who, as already stated, flatly denied that any such talk ever occurred. He says he expected the station would be put in, under the agreement of Taylor, without *extra* compensation to the contractors. The fact of the agreement by Taylor is not contradicted, but no particulars of it are given. It is not to be presumed that he agreed to put it in without any compensation. If it was to be paid for under the construc-

tion contract, then it should have been located under the right therein given to them, and in that case the place should have been designated by Pells in apt time—before all the contract stations had been located.   Pells does not say he did so designate it.   Besides, with his alleged expectation there would be no services to be rendered by him to procure it, except to designate the place ; how could he accept, as for services, from people who would derive less advantage than he from its location, the sum of $3,400, or any other sum?   He owned eighty acres on which the town of Pellsville was located, to grow up with the station, and eighty more immediately adjoining.   If anybody else had as large an interest it does not appear.   In view of his claim to this money, might not the jury have regarded the idea of a free depot, secured by the agreement before the subscription for his services was taken, as a weak attempt to defend his estate at the expense of his character?   He says he didn't know but that "he would have to buy up somebody with" this money, but doesn't claim that he did buy anybody.   He says he had expenses but specifies nothing of the kind.   He labors to account for the fact of his claiming and appropriating this fund as properly his own.

Influence and services were not required to get this *extra* station ; money alone, and nothing but money, would accomplish it ; and why he should get the money and other advantages, without influence or service, and Snell, Taylor & Co. should put in the *extra* station, was not very satisfactorily shown.

We hold, then, that upon the question of the existence of the alleged understanding between Pells and Snell, and of its effect to create an agency on the part of Pells in the receipt of the money, there was evidence to warrant the instruction and finding.

Upon the other question, whether appellees' firm did locate the station and erect the station house, and put in the switches and side track, either directly or through the Wabash company, there is no controversy as to the fact that Snell, Taylor & Co. arranged with said company to finish the road as required by the contract between appellees' firm and the L. B. & M.

R. R. Co., according to the understanding of that contract by the Wabash company. The only doubt is whether that arrangement included the Pellsville station. The evidence does not show the terms of that arrangement. It is therefore not a question of construction of its terms, but simply of fact, whether this station was included. Snell swears that he supposed, that is, that according to his understanding, it was. There is no positive evidence that it was not. Since no written evidence of the contract or arrangement was offered and no objection was made to this testimony of Snell in relation to it, we must infer that it was verbal only. Present purposes do not require us to consider and determine whether or not the circumstances proved tend to overcome or rebut his testimony, but we think there was so much of circumstantial evidence to corroborate it as to make, upon this point, a fair question for the jury; as, for example, that the station was put in and that unless the Wabash company was paid for it out of the $10,000, it does not appear that it was paid at all. And if there was evidence, positive or circumstantial, sufficient to account for their finding, reasonably and without imputing to them the indulgence of passion or prejudice or any material misunderstanding of the law or the testimony, it should not be disturbed. There has been no attempt to refer herein to all the evidence tending to maintain the issues on the part of the plaintiffs, but only to show that there was enough to require the submission of these issues to the jury.

It appears that the court prepared the instructions given—refusing all of those asked, on both sides. We think they fairly state the law applicable to the evidence. The reasons which, in our opinion, justify the refusal of those asked on the part of the defendant and not substantially included in what was given, may be inferred from our view of the law as herein above stated.

As to the issue made on the replication to the plea of the statute of limitations, the question was also mainly one of fact. The statute provides that if, after the cause of action accrues, the defendant departs from and "resides out of the State," the time of his absence is no part of the time limited

Pells v. Snell.

for the commencement of the action.   Under the former act, which did not contain the phrase above quoted, the times of absence, however brief and clearly temporary, and even though occupied in mere journeying, might be deducted.   We are inclined to the opinion that this phrase in the statute now in force means no more than a remaining, abiding, sojourning or dwelling at a place for so long a time, continuously, as to indicate that it was not merely temporary, with a view to the business or health of the party and *animo revertendi;* for the provision clearly contemplates deductions for different periods within a single year, which could hardly be if residence, in the full legal·sense, was intended.   Such abiding, remaining, sojourning or dwelling, without acquiring a legal residence, seems to be indicated by the definition and synonyms of the verb as given by Webster; and this construction would seem necessary in order to give reasonable effect to the section of the statute in question.   This was the construction given to it by the court below.

That Pells, after the cause of action, if any there was, accrued, did depart from and " reside" out of the State in that sense, there was much evidence to prove, although it is probably true that he made provision and expected to be, much of his time, at his daughter's home, in Paxton, Ill.   The special interrogatory submitted to and answered by the jury was broader than it needed to be; and yet that finding was not without support in the evidence.   His residence, for many years prior and up to the spring of 1872, is conceded to have been at Ridgely, Orleans county, N. Y., and, after all, the truth seems to be about what he stated to Mr. Dennis, the clergyman of Medina, only six weeks before the trial at Danville—that he spent part of his time at Paxton, part at Petrowsky, Mich.; part at Rochester, N. Y., and had no home anywhere.   That condition appears to have continued to the time of his death.   On this issue, then, the verdict is fairly supported by evidence—not conclusive, indeed, but clearly tending to that conclusion.

Perceiving no material error in the record, the judgment will be affirmed.

*Judgment affirmed.*